UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SECURITIES AND EXCHANGE COMMISSION,

                          Plaintiff,

         -against-

OPULENTICA, LLC, ZARRAR SHEIKH, and
NASSER A. DAWOUD,

                    Defendants,

         -and-

SAIMA SHAHZADI,

                    Relief Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

03 Civ. 10165  (RJH)

**<u>MEMORANDUM OPINION
AND ORDER</u>**

        The Securities and Exchange Commission ("SEC" or "Commission") brought this action charging Opulentica, LLC ("Opulentica"), Zarrar Sheikh, and Nasser A. Dawoud (collectively, "defendants") with engaging in a fraudulent scheme to offer unregistered securities, to divert the proceeds of the offering to the personal use of the defendants, and to make material false representations in the course of selling the securities, in violation of sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a), and section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  In addition, the SEC charged relief defendant Saima Shahzadi, Sheikh's wife, with receiving a portion of the ill-gotten gains.  On January 12, 2004, the Court entered an order on consent of Opulentica, Sheikh, and Shahzadi, preliminarily enjoining them

from future violations of the Securities Act or the Exchange Act, freezing their assets, and granting the SEC other interim equitable relief.  On the same day, Dawoud consented to the entry of a Partial Final Consent Judgment ("Consent Judgment"), enjoining him from future violations of the securities laws.  The Consent Judgment required Dawoud to "disgorge the full amount of his ill-gotten gains from the conduct alleged in the Complaint, plus prejudgment interest . . . in an amount to be determined by the parties or, failing that, by the Court" and to "pay a civil penalty . . . in an amount to be determined by the Court and upon application of the Commission."

The SEC now moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), and requests that the Court permanently enjoin Opulentica and Sheikh from future violations of the securities laws.  The SEC also asks the Court to order Sheikh and Dawoud to pay disgorgement, prejudgment interest, and civil penalties. Dawoud does not object to the entry of summary judgment on the securities violations or to the propriety of disgorgement and a civil penalty, but he disputes the amounts proposed by the SEC.  Sheikh, who is proceeding pro se, has not responded to the SEC's motion.[1]  For the reasons set forth below, the SEC's motion [27] is granted.

**BACKGROUND**

The following facts are drawn from plaintiff's statement of material facts ("56.1 Statement") and defendant Dawoud's counterstatement ("Counterstatement").  Where disputed, the facts are construed in favor of the nonmoving parties.  *See Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999).

---

[1] By order dated October 6, 2006, the Court advised Sheikh that if he failed to file opposition papers prior to November 1, 2006, the Court would consider the SEC's motion unopposed as to him.

Opulentica is a New York limited liability company formed in May 2002.  (56.1 Statement ¶ 1.)  Opulentica represented itself as "a stock trading firm that deals with short term capital management" and solicited investors to open accounts with Opulentica for periods of three, six, nine, and twelve months.  (Pl's Mot. for Summary Judgment ("Mot."), Hanson Decl., Ex. 4).  Opulentica claimed that its founders were a "Michael Cohan" with "over 15 years . . . on Wall Street" and a "Jim Stopaznev," an experienced currency trader and financial analyst.  (*Id.*)  Its website, *www.opulentica.com*, listed thirteen other employees, including eleven licensed financial analysts and traders, a compliance officer, and a chief financial officer.  (*Id.*)  Defendant Sheikh's name was listed under "Media Relations" and "Traders/Analysts."  (*Id.*)  Opulentica also claimed to have offices located at 44 Wall Street, New York, New York.  (56.1 Statement ¶ 1.)

Opulentica recruited investors through its website, regular advertisements in two Arabic-language newspapers marketed to the Pakistani-American community, and written offering materials.  (*Id.* ¶ 9.)  These materials promised investors risk-free monthly returns of six percent and risk-free annual returns of seventy-two percent (*id.* ¶¶ 6, 9–10), and stated that all investments were insured up to $10.5 million per account and $100 million in aggregate (*id.* ¶¶ 7, 15, 17).  Opulentica's website also stated that investors would receive monthly interest checks.  (Hanson Decl., Ex. 4.)

Between May 2002 and December 2003, at least twenty individuals invested $534,043.60 with Opulentica (*id.* ¶ 20), although Opulentica itself claimed to have "$1.2 million in assets under management from diverse offerings" (*id.* ¶ 9).  Opulentica tried to lull these investors into thinking that it was capable of producing the promised returns by returning $90,081.50 to investors over the course of the scheme.  In actuality, however,

Opulentica did not employ professional traders and analysts to manage investors' funds—of the fifteen employees listed on Opulentica's website, only Sheikh was a real person (*id.* ¶ 22)—and its purported offices at 44 Wall Street were nothing more than a mail drop and a telephone answering service (*id.* ¶ 1). Opulentica's securities were not registered, and Opulentica never filed a Form D with the SEC. (*Id.* ¶ 23.) Although Opulentica did in fact transfer some of the solicited funds into eight trading accounts at Ameritrade, E*TRADE Financial, and MB Trading, ultimately Opulentica incurred trading losses of $117,635.10 (*id.* ¶¶ 14–15). Further, Opulentica's investments were not insured as promised. (*Id.* ¶¶ 15–18.) As a result, investors did not receive the six-percent monthly returns promised by Opulentica. (*Id.* ¶ 14.) Instead, while Sheikh was in Pakistan seeking to expand Opulentica's business, at his request Dawoud initiated an international wire transfer of $40,000 from Opulentica's bank account on September 29, 2003, and then transferred $15,000 from the same bank account to an account in Lahore, Pakistan on October 27, 2003. (*Id.* ¶ 19; Counterstatement ¶ 3.) Sheikh and Dawoud also used investor funds for personal expenses, including food, rent, clothing, and gym membership. (*Id.* 7–8, 19.)

On December 19, 2003, the United States Attorney for the Southern District of New York ("U.S. Attorney") filed a complaint in the criminal case, *United States v. Zarrar Sheikh and Nassar A. Dawoud*, 04 Cr. 58 (BSJ), and, four days later, federal law enforcement agents arrested Sheikh and Dawoud. (*Id.* ¶ 4.) The criminal case charged Sheikh and Dawoud with one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1341, and securities fraud, in connection with the purchase and sale of securities in violation of section 10(b) of the Exchange Act and Rule 10b-5, and three

counts of mail fraud.  (Hanson Decl., Ex. 13.)  The SEC filed the instant civil case against defendants on December 23, 2003.  Following the entry on consent of a preliminary injunction against Opulentica, Sheikh, and Shahzadi, and the Consent Judgment against Dawoud, the Court granted defendants' request that the civil action be stayed pending the resolution of the parallel criminal proceeding.

Dawoud quickly pleaded guilty to all four counts in the criminal indictment, after which he provided the government with substantial assistance in the criminal case against Sheikh.  (*United States v. Sheikh*, No. 04 Cr. 58 (BSJ), Dawoud Sentencing Tr. 26–27, Sept. 22, 2005.)  Sheikh pleaded guilty on August 6, 2004, a mere four days before trial.  (56.1 Statement ¶ 5; *United States v. Sheikh*, No. 04 Cr. 58 (BSJ), Sheikh Plea Tr. 16, Aug. 6, 2004.)  At his plea allocution, Sheikh admitted that he "put false statements on the Internet and in the newspapers and several other[] documents that misrepresent the actual nature of the company that [he] had built," and that his purpose was to encourage people to invest in Opulentica.  (56.1 Statement ¶ 7.)  He also admitted that he lied to investors in stating that their funds with Opulentica were insured.  (*Id.*)  Additionally, Sheikh admitted he told investors that their money would be invested in the stock market, but that he actually used the money for his own personal benefit.  (*Id.*)  It is undisputed that Sheikh was the primary beneficiary of the fraudulent scheme.  Sheikh, rather than Dawoud, communicated with investors and controlled the funds in the bank accounts and trading accounts.  (*Id.* ¶ 3; Counterstatement ¶ 8–10.)  Sheikh was identified as the administrative contact for Opulentica's website, as the contact person in Opulentica's newspaper advertisements, and as the media relations contact in offering materials mailed to at least one investor.  (*Id.* ¶ 2.)  Judge Barbara S. Jones, who presided over Sheikh's

criminal case, stated at his sentencing that Sheikh diverted over $185,000 of investors' money for his own personal use, including $55,000 for the purchase of real estate in Pakistan.  (*United States v. Sheikh*, No. 04 Cr. 58 (BSJ), Sheikh Sentencing Tr. 5, 16–17, March 22, 2005.)  In addition, Sheikh filed the company's Articles of Organization (Hanson Decl., Ex. 1) and set up the mail drop and answering service at 44 Wall Street (56.1 Statement ¶ 2).  Consequently, Judge Jones sentenced Sheikh to forty-six months in prison and ordered Sheikh to pay restitution of $443,962.10, the full amount netted in the fraudulent scheme.  (*Id.* ¶ 5).  The Second Circuit has affirmed this sentence.  (*United States v. Sheikh*, No. 05-1747-cr, Summary Order (2d Cir. Jan. 5, 2006).)

Dawoud, in contrast, was a much smaller beneficiary of the fraudulent scheme with a correspondingly smaller role.[2]  Dawoud picked up the mail at 44 Wall Street, permitted Sheikh to use his name and personal information to open bank accounts and one online trading account, and withdrew funds from Opulentica's bank accounts to pay for the newspaper advertisements and to pay for the mail drop and answering service.  He also made small withdrawals from Opulentica's bank accounts for his personal use.  (Counterstatement ¶ 3.)  In an account opening statement filed with Citibank, N.A., Dawoud held himself out to be the president of Opulentica.  (56.1 Statement ¶ 3; Counterstatement ¶ 3.)  Dawoud also admits to having filed fraudulent debit statements with the bank and a police report regarding those debits at Sheik's direction.  (Counterstatement ¶ 3.)  However, it is undisputed that Dawoud had no contact with

---

[2] The SEC does not dispute Dawoud's description of his role in the scheme but argues that Dawoud should nevertheless be ordered to disgorge $443,962.10 and pay third-tier civil penalties because "without Dawoud's participation, the Opulentica fraud might never have happened, and losses to investors might have been lessened."  *See infra* Discussion pt. 2.

investors, did not prepare any of the offering materials or website content, and made only one deposit of investor funds into an Opulentica account, while Sheikh was in Pakistan. (*Id.* ¶ 8.)  Roberto Finzi, counsel for the government in the criminal case, made the following statement to the Judge Jones, which the SEC does not dispute:

> MR. FINZI:  Usually when I come to these proceedings I want to be careful to not try to sugar coat a defendant's or cooperator's conduct too much.  There is a tendency in this job to try to take their side too much and try to paint a picture of a cooperator who is better than —or better than perhaps he is.
>
> In this case I was concerned about the opposite.  What I wrote in the letter about his conduct really being a small fraction of what his codefendant's was really is true.  And we approach these cases very skeptically.  When someone comes in and tells me, Over the course of 18 months I only made $10,000 off of this and I never talked to an investor and I never reviewed the literature, your initial reaction is skeptical.  But we went ahead and investigated that.  I have spoken to almost all of the investors in this case.  None of them have ever said that they spoke with anyone other than Mr. Sheikh.  Likewise we reviewed bank records fairly extensively, and I have absolutely no reason to believe that Mr. Dawoud made any more money than he did.
>
> THE COURT:  That's rather important to me.  Is the full extent here the $10,000 that I have read about in the presentence report?
>
> MR. FINZI:  I think that is absolutely correct, your Honor. . . . And I am convinced as I stand here today that the total sum that Mr. Dawoud received for his participation in the fraud is that $10,000.  And setting aside perhaps much smaller, be they gifts, lunches, things like that, but really trivial things.

(*United States v. Sheikh*, No. 04 Cr. 58 (BSJ), Dawoud Sentencing Tr. 13–14, Sept. 22, 2005.)  Dawoud has since clarified that the actual amount is $10,260.  (Opp'n ¶ 9.)  On this basis, the court sentenced Dawoud to three years probation and did not order him to pay restitution.  (*Id.* ¶ 5.)

## DISCUSSION

1.  **Summary Judgment**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears the burden of demonstrating that no genuine issue of fact exists for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). Once the moving party succeeds in this showing, the burden shifts to the nonmoving party to demonstrate that an issue of material fact does exist. *Id.* In order to defeat a motion for summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(c)).

As Dawoud does not object to the entry of summary judgment on the securities violations, the Court will consider only whether summary judgment is appropriate with respect to Opulentica and Sheikh. Although neither Opulentica nor Sheikh has filed a response to the SEC's motion, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting *Amaker v. Foley*, 274

F.3d 677, 681 (2d Cir. 2001)).  "Moreover, in determining whether the moving party has

met this burden of showing the absence of a genuine issue for trial, the district court may

not rely solely on the statement of undisputed facts contained in the moving party's Rule

56.1 statement.  It must be satisfied that the citation to evidence in the record supports the

assertion."  *Id.* (citation omitted).

Here, the SEC's motion for summary judgment is supported by a voluminous

record.  The Court has reviewed the thirty-five exhibits submitted by the SEC, read the

plea allocutions and sentencing transcripts in the criminal case against Sheikh and

Dawoud, and studied the memoranda submitted by the SEC and Dawoud.  On the basis

of that record, the Court finds that the government has met its burden for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

A.   <u>Section 10 of the Exchange Act, Rule 10b-5, and Section 17(a) of the
Securities Act</u>

Sheikh was convicted by guilty plea on securities-fraud charges related to the

same activities at issue here.  Thus, all questions of fact material to and underlying

Sheik's criminal conviction, as established during the plea allocution, bind Sheikh in this

subsequent civil action.  Federal criminal convictions have a collateral estoppel effect in

federal civil actions under a four-part test:  "(1) the issues in both proceedings must be

identical, (2) the issue in the prior proceeding must have been actually litigated and

actually decided, (3) there must have been a full and fair opportunity for litigation in the

prior proceeding, and (4) the issue previously litigated must have been necessary to

support a valid and final judgment on the merits."  *Gelb v. Royal Globe Ins. Co.*, 798

F.2d 38, 42–43 (2d Cir. 1986); *see also United States v. Podell*, 572 F.2d 31, 35 (2d Cir.

1978) ("It is well-settled that a criminal conviction, whether by jury verdict or guilty plea,

constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case."); *SEC v. Roor*, 2004 U.S. Dist. LEXIS 17416, 2004 WL 1933578, at *7 (S.D.N.Y. Aug. 30, 2004) (granting summary judgment in an SEC enforcement action based on collateral estoppel following the defendant's guilty plea). "Whether established at plea allocution or at trial, all facts material to the conviction bind the criminal defendant in later civil litigation." *SEC v. McCaskey*, No. 98 Civ. 6153 (SWK), 2001 U.S. Dist. LEXIS 13571, 2001 WL 1029053, at *3 (S.D.N.Y. Sept. 6, 2001).

The SEC's First Claim for Relief charges Sheikh with violations of section 10(b) and Rule 10b-5. "[T]he fact that [Sheikh] allocuted to these very offenses in his criminal prosecution has a binding estoppel effect against him in the instant civil action." *McCaskey*, 2001 U.S. Dist. LEXIS 13571, 2001 WL 1029053, at *3. The factual background set forth by Sheikh during his allocution describes his involvement in the same activities alleged by the SEC in the instant action. To prove a violation of section 10(b) and Rule 10b-5, the SEC must demonstrate that a defendant (1) in the offer or sale, or in connection with the purchase or sale, (2) of securities, (3) made untrue statements of material fact or omitted disclosure of material fact, (4) with scienter. *See Basic, Inc. v. Levinson*, 485 U.S. 224 (1988). Sheikh's allocution establishes each element of these violations. Sheikh admitted that he "put false statements on the Internet and in the newspapers and several other documents . . . . to get people to invest in the company." (*United States v. Sheikh*, No. 04 Cr. 58 (BSJ), Sheikh Plea Tr. 16, Aug. 6, 2004.) He admitted that he represented to investors that their money would be invested in the stock market, and that their investments would be insured, and that he knew these statements

were false when he made them.  (*Id.* 17–18.)  He further admitted that he used some of the money for his own personal benefit.  (*Id.* 17.)  With these details thus established, and with the district court's acceptance of Sheikh's plea as a knowing and voluntary admission of guilt (*id.* 20–21), Sheikh is now precluded from denying the facts underlying his criminal conviction.  The SEC's motion for summary judgment on the claims relating to Sheikh's section 10(b) and Rule 10b-5 violations is therefore granted.

The SEC's First Claim for Relief also charges Sheikh with a violation of Section 17(a), a violation with which Sheikh was not charged in the parallel criminal case and to which he did not plead guilty.  "Section 17(a) of the Securities Act is a general prohibition against fraud in the offer or sale of securities, using the mails or the instruments of interstate commerce."  *McCaskey*, 2001 U.S. Dist. LEXIS 13571, 2001 WL 1029053, at *4; *see* 15 U.S.C. § 77q(a).  The Second Circuit has held that "essentially the same elements are required under Section 17(a)(1) in connection with the offer or sale of a security" as are required for a violation of section 10(b) and Rule 10b-5, including scienter.  *See SEC v. Monarch Funding Group*, 192 F.3d 295, 308.  Because Sheikh's guilty plea to section 10(b) and Rule 10b-5 served as "an admission of all the elements of [the] formal criminal charge," *LaMagna v. United States*, 646 F.2d 775 (2d Cir. 1981), the elements of section 17(a) have also been met.  Moreover, Sheikh pled guilty to three counts of mail fraud in connection with the securities fraud, and admitted that he "caused people to send money in to [him] through the mails," and that he knew what he was doing was "wrong and illegal."  (*United States v. Sheikh*, No. 04 Cr. 58 (BSJ), Sheikh Plea Tr. 20, Aug. 6, 2004.)  "Thus, although not explicitly pleading to a Section 17(a) violation, [Sheikh] nonetheless provided the factual foundation to support

such a claim.  These facts were material to his conviction on related securities charges."

*McCaskey*, 2001 U.S. Dist. LEXIS 13571, 2001 WL 1029053, at *4.  Sheikh is therefore

estopped from denying these allocuted facts, which here form the basis for a section 17(a)

civil violation.  Accordingly, summary judgment is granted on the SEC's section 17(a)

claim against Sheikh.

> B.  <u>Sections 5(a) and (c) of the Securities Act</u>

The SEC's Second Claim for Relief charges Sheikh with violations of sections

5(a) and (c) of the Securities Act ("Section 5").  To establish a prima facie Section 5

violation, the SEC must show that (1) the defendant offered to sell or sold a security, (2)

did so through the use of mails or interstate commerce, and (3) no registration statement

was filed or was in effect as to that security.  *See S.E.C. v. Cavanagh*, 445 F.3d 105, 111

n. 13 (2d Cir. 2006); 15 U.S.C. §§ 77e(a), (c).  Section 5 applies to issuers, underwriters,

or dealers, *see* § 77d(1), with "dealer" defined as "any person who engages either for all

or part of his time, directly or indirectly, as agent, broker, or principal, in the business of

offering, buying, selling, or otherwise dealing or trading in securities issued by another

person," § 77b(a)(12).  As Opulentica's registered agent, Sheikh falls within the

definition of "dealer," and accordingly, within the purview of the registration's

provisions.  The prima facie case is satisfied here:  As noted already, Sheikh has pleaded

guilty to offering and selling securities and to using the mails to do so, and it is

undisputed that Opulentica did not file a registration statement for its trading accounts

with the Commission.

The burden is on defendant to prove that a registration exemption applies.  *SEC v.*

*Ralston Purina Co.*, 346 U.S. 119, 126 (1953) ("Keeping in mind the broadly remedial

purposes of federal securities legislation, imposition of the burden of proof on an issuer

who would plead the exemption seems to us fair and reasonable."); *see also Byrnes v.*

*Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1311 (2d Cir. 1977); *Rosen ex rel.*

*Egghead.com, Inc. v. Brookhaven Capital Mgmt. Co.*, 194 F. Supp. 2d 224, 228

(S.D.N.Y. 2002) ("Courts have also specifically held in the securities context that

defendants have the burden to plead and prove statutory exemptions.").  Sheikh has not

responded and has not pleaded a statutory exemption.  Reviewing the application of the

facts to possible exemptions, however, the Court finds that none applies.  Because

Opulentica and the individual defendants offered to sell securities to the public by

soliciting sales on their website and advertising in newspapers, they are not entitled to an

exemption under section 4(2) of the Securities Act, 15 U.S.C. § 77d, for transactions by

an issuer not involving any public offering.  *See Steed Fin. LDC v. Nomura Sec. Int'l,*

*Inc.*, No. 00 Civ. 8058 (NRB), 2001 U.S. Dist. LEXIS 14761, 2001 WL 1111508

(S.D.N.Y. Sept. 20, 2001) ("In determining whether a transaction involves a public

offering, the critical question is 'whether the persons to whom the offering is made are in

such a position with respect to the issuer that they either actually have such information

as a registration would have disclosed, or have access to such information.'" (quoting

*Gilligan, Will & Co. v. SEC*, 267 F.2d 461 (2d Cir. 1959)).  Nor is Rule 504's exemption

from registration available as the company claimed to have over $1.2 million in assets

under management and had no express limitation on the size of the offering.  *See* 17

C.F.R. § 230.504(b)(2).  The exemptions from registration contained in Rules 505 and

506 of Regulation D of the Securities Act are not applicable because defendants engaged

in a general solicitation.  *See id.* §§ 230.502(c), 230.505(b)(1), 230.506(b)(1).

Consequently, Sheikh is liable for unlawfully dealing in unregistered securities.

The Court therefore grants summary judgment to the SEC on both of its claims, and finds that Sheikh and Dawoud engaged in a fraudulent scheme to offer unregistered securities, to divert the proceeds of the offering to the personal use of the defendants, and to make material false representations in the course of selling the securities.  Because Sheikh and Dawoud perpetrated their fraud through Opulentica, the Court also grants summary judgment against Opulentica.

**2.**      **Injunctive Relief, Disgorgement, and Civil Penalties**

With respect to relief, the SEC requests a permanent injunction against Opulentica and Sheikh, an order of joint and several disgorgement in the amount of $443,962.10 (the full net profit of the scheme), and third-tier civil penalties for both Sheikh and Dawoud.

a.      *Permanent Injunction*

The SEC moves to permanently enjoin Sheikh and Opulentica from future violations of the securities laws.  Both the Securities Act and the Exchange Act provide for the issuance of permanent injunctive relief in the face of a violation of any of their provisions, *see* 15 U.S.C. § 77t(b); 15 U.S.C. §§ 78u(d)(e), 78u-1, and such relief may be granted upon a summary judgment motion by the SEC, *McCaskey*, 2001 U.S. Dist. LEXIS 13571, 2001 WL 1029053, at *5 & n.2 (citing *SEC v. Research Automation Corp.*, 585 F.2d 31, 36 (2d Cir. 1978)).  "To award such relief, a court must look beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence, but fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations."  *SEC v. Platinum Inv. Corp.*, No. 02 Civ. 6093 (JSR), 2006 U.S.

Dist. LEXIS 67460, 2006 WL 2707319, *4 (S.D.N.Y. Sept. 20, 2006) (quotations and internal citations omitted) (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir.1996)).  In determining whether there is a realistic likelihood that a defendant will violate the securities laws in the future, courts look to a number of factors:  (1) the degree of scienter involved; (2) the isolated or persistent nature of the past fraudulent acts; (3) the defendant's appreciation of his wrongdoing; and (4) the defendant's opportunities to commit future violations.  *See SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 867 (S.D.N.Y. 1997).

Here, considering the totality of the circumstances and all of the relevant factors, the Court believes injunctive relief is required.  The record reflects that Sheikh willfully and knowingly solicited investors with false promises of risk-free returns and then diverted more than $185,000 for his personal use.  As Judge Jones stated at Sheik's sentencing, the "fraud here was blatant."  (*United States v. Sheikh*, No. 04 Cr. 58 (BSJ), Sheikh Sentencing Tr. 27, March 22, 2005.)  Sheik's behavior did not arise from a single, isolated incident, but rather represented a continuing course of wrongful conduct of more than eighteen months.  Furthermore, Sheik's guilty plea in the parallel criminal case does not conclusively establish his appreciation of his past wrongdoing.  Sheikh pled very close to the trial date.  Finally, although Sheikh is currently incarcerated, once he is released he will once again have the means to perpetrate a fraud like the one here.  In light of the above facts, there is a likelihood that, unless enjoined, Sheikh will continue to violate federal securities laws.  Accordingly, the SEC's request to permanently enjoin Sheikh from future violations of the securities laws is granted.

b.      *Disgorgement*

Disgorgement of illicit profits is a proper equitable remedy for securities fraud. *See, e.g., SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) ("[disgorgement] 'is a method of forcing a defendant to give up the amount by which he was unjustly enriched'") (quoting *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978)).  "A district court has 'broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged.'"  *SEC v. Svoboda* 409 F. Supp. 2d 331, 344 (S.D.N.Y. 2006) (quoting *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474–75 (2d Cir. 1996).  "The primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains." *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997).  Because the distribution of disgorged profits to fraud victims is a secondary goal, "the size of a disgorgement order 'need not be tied to the losses suffered by defrauded investors.'"  *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006) (quoting *Fischbach Corp.*, 133 F.3d at 175–76).  "The principal issue, therefore, in determining the amount of disgorgement to be ordered is the amount of gain received by each defendant from the fraud." *SEC v. Inorganic Recycling Corp.*, No. 99 Civ. 10159 (GEL), 2002 U.S. Dist. LEXIS 15817, 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002); *see Commonwealth Chem. Sec., Inc.*, 574 F.2d at 102.  Although the SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment, once the SEC has made a reasonable showing of a defendant's illicit profits, the burden shifts to the defendant to show that the disgorgement figure was not a reasonable approximation.  *S.E.C. v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1232

(D.C. Cir. 1989).  The defendant satisfies this burden by "demonstrating that he received less than the full amount allegedly misappropriated and sought to be disgorged." *SEC v. Benson*, 657 F. Supp. 1122, 1133 (S.D.N.Y. 1987) (citation omitted).

The SEC has demonstrated that Opulentica, Sheikh, and Dawoud unlawfully obtained approximately $543,043.60 from about twenty investors.  The defendants returned approximately $90,081.50 to investors in order to maintain their trust.  Therefore, the total unlawful gains appropriate for disgorgement from Opulentica is $443,962.10.  Because this entire sum was unlawfully obtained through the fraudulent scheme, the only remaining issue with regard to the disgorgement amount is the proportion to be paid by each defendant.

The Court disagrees with the SEC's argument that Dawoud should be held jointly and severally liable for the full disgorgement amount.  Although the court has the discretion to find joint and several liability when two or more defendants have collaborated in the illegal conduct, *SEC v. Cavanagh*, No. 98 CIV. 1818 (DLC), 2004 U.S. Dist. LEXIS 13372, 2004 WL 1594818, at *29 (S.D.N.Y. Jul. 16, 2004), courts have declined to do so where defendants have differing levels of culpability, *see, e.g., Platinum Inv. Corp.*, 2006 U.S. Dist. LEXIS 67460, 2006 WL 2707319, at *4 (declining to impose joint and several liability where the defendant was a "small player in the fraud"); *see also SEC v. Falbo*, 14 F. Supp. 2d 508, 527 (S.D.N.Y. 1998) (refusing joint and several liability where the SEC failed to present evidence that tippee derived any financial benefit from the illegal trading of anyone he tipped); *SEC v. Downe*, 969 F. Supp. 149, 158 (S.D.N.Y. 1997) (same).  As Judge Jones observed at sentencing, Dawoud's "participation in this conspiracy was vastly different, much more minor than

was Mr. Sheikh's, which, frankly, is reflected in the amount that [he] received personally as well." (*See United States v. Sheikh*, No. 04 Cr. 58 (BSJ), Dawoud Sentencing Tr. 26–27, Sept. 22, 2005.) The SEC does not dispute that Dawoud received only $10,260 of the illicit profits. Accordingly, the Court declines to exercise its discretion to charge Dawoud with joint and several liability and instead orders Dawoud to disgorge only his personal pecuniary gain of $10,260, plus prejudgment interest (to be recalculated by the SEC).

Sheikh has not opposed the SEC's request that he be held liable for the full amount of the defendants' unlawful gains. Because the SEC has sufficiently demonstrated that the defendants unlawfully obtained $443,962.10, the burden shifts to Sheikh to show that he gained less than this amount. *See SEC v. Svoboda*, 409 F. Supp. 2d 331, 344 (S.D.N.Y. 2006). Sheikh as failed to make such a demonstration. Moreover, Judge Jones has already ordered Sheikh to pay restitution in the full amount of $443,962.10. Accordingly, the Court orders Sheikh to disgorge the remainder of the illicit profits, $443,962.10 minus $10,260, for a total amount of $433,702.10, plus prejudgment interest (to be recalculated by the SEC). To the extent that Sheikh pays or has paid restitution as ordered in the criminal judgment, such payments will offset his disgorgement obligation under the present judgment. *See SEC v. Palmisano*, 135 F.3d 860, 864 (2d Cir. 1998).

    c.    *Civil Penalties*

Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d), provide for the imposition of civil penalties, for any violation of the Act involving "fraud, deceit, manipulation, or deliberate or reckless

disregard of a regulatory requirement" that "resulted in . . . or created a significant risk of substantial losses," up to a maximum (for individual defendants) of the greater of $120,000 for each violation or the gross pecuniary gain from the violation.[3]  Civil penalties are designed to punish the individual violator and deter future violations of the securities laws.  *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996).  In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.  *See SEC v. Coates*, 137 F. Supp. 2d 413, 428–29 (S.D.N.Y. 2001) (listing factors); *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395 (RWS), 2002 U.S. Dist. LEXIS 20597, 2002 WL 31422602 (S.D.N.Y. Oct. 29, 2002).  While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a "discretionary nature" and each case "has its own particular facts and circumstances which determine the appropriate penalty to be imposed."  *Moran*, 944 F. Supp. at 296–97.  Although the SEC requests the Court to impose third-tier civil penalties against both Sheikh and Dawoud, the SEC has not requested a specific amount.  The Court will consider the appropriate penalty for each defendant in turn.

  Sheikh's violations of the securities laws plainly support the imposition of a third-tier civil penalty.  Sheikh has allocuted to a principal role in a fraudulent scheme that

---

[3] In 2001 the maximum civil penalty was increased from $100,000 to $120,000.  *See* 17 C.F.R. § 201.1002 (2006).

deprived investors of $443,962.10, and he is further admitted to diverting at least $185,000 for his personal use.  These facts alone warrant imposition of a third-tier penalty under the relevant statutes, satisfying as it does the requirement that the violations involved fraud and resulted in substantial losses.  "Disgorgement alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to keep the profits if [he] is not detected, and requires only a return of ill-gotten gains if [he] is caught." *Inorganic Recycling Corp.*, 2002 U.S. Dist. LEXIS 15817, 2002 WL 1968341, at *2. Here, in view of the seriousness of the fraud, the significant role played by Sheikh, and the extent of the benefits that he indisputably received from the violations of the securities laws, the maximum fine—an amount equal to the disgorgement sum—would be appropriate.  However, in view of the size of other financial components of the judgment, and the unlikelihood of recovery, and taking all the facts and circumstances of the case into account, a penalty of only $120,000 is imposed.  *See id.*

Dawoud, fully acknowledging his accountability for the fraud, does not object to the propriety of a civil penalty, but submits to the Court that his "involvement and conduct should result in a minimal first-tier penalty" (Opp'n ¶ 24), which is up to $6,500 or the gross amount of pecuniary gain to the defendant, *see* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d); 17 C.F.R. §201.1002.  The Court agrees.  As noted above, Dawoud is in a different position than Sheikh.  He was a much smaller beneficiary of the fraudulent scheme.  Moreover, he has demonstrated meaningful contrition by his prompt and significant cooperation in the criminal investigation conducted by the U.S. Attorney's Office.  At least one other court in this district, faced with similar facts, declined to impose a civil penalty, reasoning that "[s]uch cooperation is important to the

investigation, prosecution and punishment of frauds of this kind, and should be rewarded." *Inorganic Recycling Corp.*, 2002 U.S. Dist. LEXIS 15817, 2002 WL 1968341, at *5. Taking into account Dawoud's role in the fraud and his cooperation afterwards, the Court concludes that the appropriate civil penalty in Dawoud's case is $5,000.

## CONCLUSION

For the foregoing reasons, the SEC's motion for summary judgment [27] is granted. The Court concludes that Opulentica and Sheikh have committed civil violations of sections 5(a), 5(c), and 17(a) of the Securities Act, section 10(b) of the Exchange Act, and Rule 10b-5. The Court grants the SEC's request for permanent injunctive relief and enjoins Opulentica and Sheikh from violating these securities laws. Judgment will be entered against Sheikh for disgorgement in the amount of $443,962.10, plus prejudgment interest in an amount to be calculated by the SEC and submitted to this Court within thirty days of this Order; and for a civil penalty in the amount of $120,000. Judgment will enter against Dawoud for disgorgement in the amount of $10,260, plus prejudgment interest in an amount to be calculated by the SEC and submitted to this Court within thirty days of this Order; and for a civil penalty in the amount of $5,000.

SO ORDERED.

Dated: New York, New York
March 20, 2007

Richard J. Holwell
United States District Judge

21